# EXHIBIT A



1 | David J. Miclean (#115098)
Tamara D. Fraizer (#215942)
2 | FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
3 | Redwood City, CA 94063
Telephone: (650) 839-5070
4 | Facsimile: (650) 839-5071

5 | Attorneys for Plaintiff
KYPHON INC.

6

ENDORSED FILED

JUL -8 04

..RI TORRE, CEO
..RIOR COURT OF CA.
CO. OF SANTA CLARA
BY_____DEPUTY
S. Marshall

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | FOR THE COUNTY OF SANTA CLARA

10 | (UNLIMITED JURISDICTION)

11

12 | KYPHON INC.,

13 |             Plaintiff,

14 | v.

15 | CHAD SAUNDERS and DOES 1 to 100,
inclusive,

16 |             Defendants.

17

18

19

20

Case No. 104CV022915

**COMPLAINT FOR TRADE SECRET
MISAPPROPRIATION, UNFAIR
COMPETITION, UNFAIR BUSINESS
PRACTICES, FALSE ADVERTISING,
BREACH OF CONTRACT, BREACH OF
CONFIDENCE, CONVERSION, AND
INTERFERENCE WITH PROSPECTIVE
ECONOMIC ADVANTAGE**

**DEMAND FOR JURY TRIAL**

21 |         Plaintiff Kyphon Inc. ("Kyphon") as and for its complaint against Defendant Chad Saunders

22 | ("Saunders") and Does 1 to 100 alleges as follows:

23 | **I.     THE PARTIES**

24 |         1.      Kyphon is a company incorporated under the laws of Delaware with a principal place

25 | of business at 1221 Crossman Avenue, Sunnyvale, CA 94089.

26 | ///

27 | ///

28

COMPLAINT FOR TRADE SECRET MISAPPROPRIATION, UNFAIR
COMPETITION, BREACH OF CONTRACT, ET AL.
Case No.

1    2.    Chad Saunders is an individual who currently resides in Fort Mill, South Carolina.

2   Upon information and belief, Saunders previously resided in North Carolina after he accepted

3   employment with Kyphon in September 2000.

4   **II.    JURISDICTION**

5    3.    This court has jurisdiction over and is a proper venue for this action under Cal. Code

6   Civ. Proc. §395(a).

7    4.    This court has jurisdiction pursuant to agreements giving rise to this controversy,

8   which provide for personal jurisdiction of the state and federal courts of California over Defendant

9   for any lawsuit arising from or related to those agreements and filed against Defendant in the State

10   of California by plaintiff.

11   **III.    GENERAL ALLEGATIONS**

12    5.    Kyphon Inc. was founded in 1994 to develop and market a proprietary balloon

13   technology for orthopedic applications.  In 1999, Kyphon first made the KyphX® Inflatable Bone

14   Tamp and accessory instruments available to several major medical centers.  Kyphon now markets,

15   sells, and supports a full line of KyphX® products for use in orthopedic applications and, in

16   particular, for use in kyphoplasty procedures.

17    6.    Kyphoplasty is a relatively new and potentially revolutionary procedure used to treat

18   osteoporotic compression fractures of the spine.  A surgical instrument is introduced into the spine

19   and used to expand a patient's vertebra.  A medical device is then inserted to maintain the

20   expansion.  This procedure can correct deformities of the spine and restore the height of a patient.

21    7.    Over 3,900 physicians who specialize in spine surgery in the United States, Europe

22   and Korea have received training from Kyphon in the use of kyphoplasty and KyphX® products.

23   Kyphon provides and pays for laboratory space, cadavers, and instruction, as well as meals and

24   other expenses to train the physicians that it expects will use the Kyphon products.

25    8.    Chad Saunders ("Saunders") was recommended to Kyphon for employment by his

26   brother, Pat Saunders, an employee of Kyphon.  Kyphon made an offer of employment to Saunders

27   on September 27, 2000.  On September 28, 2000, Saunders signed a standard employment

28                                              2

1   agreement with Kyphon ("the Employment Agreement") and, as required by that agreement, a

2   standard proprietary information agreement in favor of Kyphon ("the Proprietary Information

3   Agreement").

4        9.    As part of the Proprietary Information Agreement, employees including Saunders

5   agreed, both during and after employment with Kyphon, to "hold in strictest confidence, and not

6   use, except for the benefit of the company, or disclose to any person, firm or corporation without

7   written authorization of the Board of Directors of the company, any confidential information of the

8   company."

9        10.    By signing the Proprietary Information Agreement, employees including Saunders

10  indicated that they understood 'confidential information' to include "any of the company's

11  proprietary information, technical data, trade secrets or know how, including, but not limited to,

12  research, product plans, products, services, customer lists and customers (including, but not limited

13  to, customers of the company on whom I called or with whom I became acquainted during the term

14  of my employment), . . . marketing, finances, or other business information disclosed to me by the

15  company either directly or indirectly in writing, orally or by drawings or observations of parts or

16  equipment."

17       11.    The importance of protecting Kyphon's confidential and proprietary information was

18  further emphasized and explained to employees in the company's Employee Handbook, which

19  referred employees to the Proprietary Information Agreement. The Employee Handbook also

20  provided that employees, including Saunders, were to avoid actual or potential conflicts of interest

21  and noted explicitly that "[u]sing proprietary or confidential [Kyphon] information for personal gain

22  or to Kyphon's detriment" constituted an improper conflict of interest for employees.

23       12.    The Proprietary Information Agreement prohibited employees including Saunders

24  from engaging in employment with or consulting with any other competing business while

25  employed by Kyphon. An exhibit to the Proprietary Information Agreement prohibited employees

26  including Saunders from "revealing confidential information to outsiders, misusing confidential

27

28
                                    3

1    information, and unlawfully discussing prices, costs, customers, sales or markets with competing

2    companies or their employees."

3        13.     The Proprietary Information Agreement also required employees including Saunders

4    to return any company documents and data in their possession upon the termination of employment,

5    and prohibited them from soliciting, inducing, recruiting or encouraging any Kyphon employee to

6    leave employment at Kyphon for up to twelve months after leaving Kyphon.

7        14.     Upon information and belief, Saunders had no experience with medical devices or

8    kyphoplasty prior to his employment with Kyphon. As a Kyphon sales person, Saunders and other

9    sales persons received training in, and had access to, information about Kyphon's research,

10    products, services, marketing, sales, and actual and potential customer clients.

11        15.     Kyphon created detailed profiles of its actual and potential kyphoplasty clients.

12    These detailed profiles included standard contact information for clients such as physicians and

13    medical centers. They also included contact information for people associated with a client, such as

14    head nurses, operating room supervisors, secretaries, and purchasing agents, as well as detailed

15    private and/or personal information about the client, including for example business habits or

16    practices and purchasing preferences.

17        16.     Kyphon made its detailed profiles of actual and potential clients available to its sales

18    people who contacted those clients. Those sales people and others contributed to the development

19    of the profiles, for example, by reporting information acquired from a client contact. As a sales

20    person, Saunders and other sales people had access to the detailed profiles of the clients on whom

21    they themselves called or with whom they became acquainted during their employment with

22    Kyphon and, upon information and belief, helped build their profiles based on their personal

23    contacts with them.

24        17.     Upon information and belief, Saunders and other sales people were knowledgeable

25    about price points and discounts for Kyphon products, as well as Kyphon's actual sales, clients'

26    purchasing preferences, and Kyphon marketing strategies.

27

28

4

18.     Kyphon's marketing strategy puts highly trained sales representatives in the operating room, to observe and be available to the physicians who perform kyphoplasty procedures with Kyphon products.  Upon information and belief, through documents as well as personal observations, Saunders and other sales people are highly knowledgeable about the actual use of Kyphon products as well as Kyphon's strategy for marketing them.

19.     Saunders was moderately successful as a sales person for Kyphon.

20.     In early May, 2004, Saunders took an approximately one-week vacation.  He resigned from Kyphon promptly upon his return from that vacation.  Upon information and belief, Saunders contacted his manager Andre Potgieter ("Potgieter") when he returned to work on May 10, 2004, and alerted Potgieter of his intention to resign.  Potgieter thereafter requested Saunders to provide two week's notice and Saunders was paid through May 24.  Saunders, however, changed his mind and made May 19, 2004 his last actual day of work at Kyphon.

21.     Upon information and belief, another Kyphon employee, Chuck Foster, was gone on vacation at the same time that Saunders was gone on vacation in May 2004, and then resigned on the same day that Saunders resigned, on May 10, 2004.  Upon information and belief, Chuck Foster is subject to the same employment agreements as Saunders.

22.     Saunders' actual last day at work for Kyphon was May 19, 2004.  On that day, upon information and belief, Saunders met Potgieter in a parking lot and gave Potgieter the company laptop that Saunders had been using as well as several Kyphon-related documents that Saunders had in his possession.

23.     On the next day, May 20, 2004, Kyphon learned that a physician client of Kyphon on which Saunders called as a client, used an expandable bone tamp device made by Disc-O-Tech Medical Technologies, Ltd. And/or Disc Orthopaedic Technologies, Inc. (collectively, "DOT"), one of Kyphon's chief competitors, instead of one made by Kyphon.  Upon information and belief, Saunders arranged for the physician to use the DOT device in place of a KyphX® Inflatable Bone

1   Tamp, and assisted in the surgery.[1]  Upon information and belief, Saunders acted on behalf of DOT

2   – while employed by Kyphon – to arrange for customer(s) of Kyphon whom he had responsibility

3   for supporting on Kyphon's behalf to perform kyphoplasty procedures with DOT products rather

4   than Kyphon products.

5          24.    Upon information and belief, Saunders has also attempted to substitute DOT

6   products for the Kyphon products that medical centers have approved for use in kyphoplasty

7   procedures without the knowledge of the medical centers and without the medical centers' approval

8   of the DOT products.

9          25.    Upon information and belief, Saunders and perhaps others discussed DOT products

10  with several physician clients of Kyphon while Saunders was still employed by Kyphon.  Upon

11  information and belief, employees including Saunders used Kyphon confidential and proprietary

12  information – including but not limited to Kyphon's research results, product plans, marketing data,

13  sales techniques and strategies, and/or detailed customer client profiles – for DOT's and his own

14  benefit and not for the benefit of Kyphon.

15         26.    Upon information and belief, employees including Saunders are now using Kyphon's

16  confidential and proprietary information, including Kyphon's technical data, customer profiles, and

17  marketing information, for their own benefit and the benefit of DOT but not for the benefit of

18  Kyphon.  In particular, and upon information and belief, Saunders is using his knowledge of

19  Kyphon's products, price points, discounts, and marketing approach in conjunction with his

20  knowledge of Kyphon's clients and their purchasing preferences to sell DOT products to clients of

21  Kyphon, including Kyphon's largest clients.

22                          **FIRST CAUSE OF ACTION**
                            **(Misappropriation of Trade Secrets**
23                          **California Civil Code §§ 3426 et seq.)**

24         27.    Kyphon incorporates by reference each and every allegation contained in paragraphs

25  1-26 above as though alleged herein.

26

27  [1]   By this time, Kyphon had already sued DOT for patent infringement in the Federal District Court of Delaware, C.A.
        04-204-JJF, and in the International Trade Commission in Washington, D.C. (No. 337-TA-507).

28                                          6
                              COMPLAINT FOR TRADE SECRET MISAPPROPRIATION,
                              UNFAIR COMPETITION, BREACH OF CONTRACT, ET AL
                              Case No.

28.    Kyphon has spent substantial time, money, and effort developing confidential information relating to the commercial exploitation of its kyphoplasty products and services, including research results, product plans, marketing data, sales techniques and strategies, and detailed customer client profiles.

29.    Kyphon's confidential information derives independent economic value to Kyphon because it is not known generally to the public or others who could derive economic value from its disclosure or use, and could not lawfully be obtained by the public or others without expending substantial time and effort.

30.    At all relevant times, Kyphon has made reasonable efforts to maintain the secrecy of its confidential information and to prevent it from being used in any manner other than as desired by Kyphon.

31.    Kyphon's confidential information relating to the commercial exploitation of its kyphoplasty products and services constitutes trade secrets within the meaning of Sections 3426 et seq. of the California Civil Code.

32.    Kyphon is informed and believes, and thereon alleges, that trade secrets related to the commercial exploitation of its kyphoplasty products and services have been misappropriated by Saunders through Saunders's use and possible disclosure of such confidential trade secret information without permission and where Saunders knew, or had reason to know, that such confidential trade secrets were acquired under circumstances giving rise to a duty of limited use or secrecy.

33.    Kyphon is informed and believes, and thereon alleges, that Kyphon has lost and/or is in imminent danger of losing potential sales and customers, as well as reputation and good will, and has suffered an interruption of business due to Saunders's misappropriation of Kyphon's confidential information related to the commercial exploitation of its kyphoplasty products and services.

///

7

COMPLAINT FOR TRADE SECRET MISAPPROPRIATION, UNFAIR COMPETITION, BREACH OF CONTRACT, ET AL
Case No.

34. As a proximate result of the actions of Saunders alleged herein, Kyphon has been damaged reparably and irreparably, and Saunders has been unjustly enriched in an amount yet to be determined but which satisfies the jurisdictional requirements of this Court.

35. Saunders continues the wrongful conduct alleged herein and will continue to do so unless and until enjoined by this Court.

36. Kyphon is informed and believes, and on that basis alleges, that Saunders has acted with willfulness and maliciousness, within the definition of Section 3426.3(c) of the California Civil Code and has acted with oppression, fraud, and/or malice to deceptively represent or conceal a material fact with intent to deprive Kyphon of rights or otherwise cause injury to Kyphon pursuant to Section 3294 of the California Civil Code for which actions Kyphon is entitled to an award of exemplary damages.

37. The conduct of Saunders alleged herein entitles Kyphon to an award of its reasonable attorneys' fees pursuant to Section 3426.4 of the California Civil Code.

### SECOND CAUSE OF ACTION
#### (Unfair Competition: Unfair Business Practices
#### California Business and Professions Code §§ 17200 et seq.)

38. Kyphon incorporates by reference each and every allegation contained in paragraphs 1-37 above as though alleged herein.

39. Kyphon is informed and believes, and alleges thereon, that Saunders has engaged in the following coordinated pattern of unlawful, unfair and deceptive business practices:

(a) Consulting with a competitor of Kyphon and discussing prices, costs, customers, sales, and/or markets with the competitor while employed by Kyphon, in violation of contractual and common law obligations.

(b) Disclosing Kyphon's confidential information without written authorization of the Board of Directors or other authorized Company representative of Kyphon, in violation of contractual and common law obligations.

8

    (c)    Using Kyphon's confidential information for purposes other than the benefit of Kyphon, in particular, to make sales of DOT products to Kyphon clients, in violation of contractual and common law obligations;

    (d)    Using his prior affiliation with Kyphon to deceptively introduce DOT products into medical centers which have not approved such products for kyphoplasty procedures, in violation of contractual and common law obligations; and

    (e)    Otherwise unlawfully, unfairly, and/or deceptively conducting business to the detriment of and at the expense of Kyphon.

40.    Each instance of the above-alleged conducts of Saunders constitutes a separate and independent violation of Business and Professions Code §17200.

41.    Kyphon is informed and believes, and allege thereon, that the above-alleged conduct of Saunders is intended to disrupt Kyphon's relationships with its potential and actual customer clients with the goal of misappropriating Kyphon's business for himself and DOT.

42.    Kyphon is informed and believes, and alleges thereon, that Kyphon has lost and/or is in imminent danger of losing business from its existing and potential customers as a result of Saunders's unlawful, unfair, and deceptive business practices.

43.    As a proximate result of the actions of Saunders alleged herein, Kyphon has been damaged reparably and irreparably, and Saunders has been unjustly enriched in an amount yet to be determined but which satisfies the jurisdictional requirements of this Court.

44.    Saunders continues his wrongful conduct alleged herein and will continue to do so unless and until enjoined by this Court.

45.    As a result of the conduct of Saunders alleged herein, Kyphon is entitled to any and all orders and judgments necessary to compensate Kyphon for the harm caused to it by Saunders and to prevent Saunders from continuing to engage in such unlawful, unfair, and deceptive business practices intended to benefit Saunders and DOT to the detriment of Kyphon.

46.    Kyphon is informed and believes, and on that basis alleges, that Saunders has acted with oppression, fraud, and/or malice to deceptively represent or conceal a material fact with intent

9

COMPLAINT FOR TRADE SECRET MISAPPROPRIATION,
UNFAIR COMPETITION, BREACH OF CONTRACT, ET AL.
Case No.

1   to deprive Kyphon of rights or otherwise cause injury to Kyphon pursuant to Section 3294 of the

2   California Civil Code for which actions Kyphon is entitled to an award of exemplary damages.

3                                   **THIRD CAUSE OF ACTION**
                                 **(Unfair Competition: False Advertising**
4                       **California Business and Professions Code §§ 17500 et seq.)**

5       47.     Kyphon incorporates by reference each and every allegation contained in paragraphs

6   1-46 above as though alleged herein.

7       48.     Kyphon is informed and believes, and alleges thereon, that Saunders has engaged in

8   the following coordinated pattern of unlawful, unfair, and deceptive business practices:

9               (a)     Making of untrue or misleading representations to third party physicians

10  regarding Saunders affiliation with and duties to Kyphon, and lack of affiliation with DOT

11  during the period when Saunders was employed by Kyphon;

12              (b)     Making of untrue or misleading representations to DOT regarding Saunders'

13  relationship with Kyphon and ability to lawfully use its confidential and proprietary

14  information for the benefit of DOT; and

15              (c)     Using his prior affiliation with Kyphon to deceptively introduce DOT

16  products into medical centers which have not approved such product for kyphoplasty

17  procedures;

18              (d)     Making untrue and misleading representations about the quality, capability

19  and performance of Kyphon's products and how DOT's products supposedly favorably

20  compare thereto; and

21              (e)     Otherwise making untrue or misleading representations in business to the

22  detriment of and at the expense of Kyphon.

23      49.     Each instance of the above-alleged conducts of Saunders constitutes a separate and

24  independent violation of Business and Professions § 17500.

25      50.     Kyphon is informed and believes, and alleges thereon, that the above-alleged

26  conduct of Saunders is intended to disrupt Kyphon's relationships with its potential and actual

27  customer clients with the goal of misappropriating Kyphon's business to himself and DOT.

28                                              10

51. Kyphon is informed and believes, and alleges thereon, that Kyphon has lost and/or is in imminent danger of losing business from its existing and potential customers as a result of Saunders's unlawful, unfair, and deceptive business practices.

52. As a proximate result of the actions of Saunders alleged herein, Kyphon has been damaged reparably and irreparably, and Saunders has been unjustly enriched in an amount yet to be determined but which satisfies the jurisdictional requirements of this Court.

53. Saunders continues his wrongful conduct alleged herein and will continue to do so unless and until enjoined by this Court.

54. As a result of the conduct of Saunders alleged herein, Kyphon is entitled to any and all orders and judgments necessary to compensate Kyphon for the harm caused to it by Saunders and to prevent Saunders from continuing to engage in such unlawful, unfair and deceptive business practices intended to benefit Saunders and DOT to the detriment of Kyphon.

55. Kyphon is informed and believes, and on that basis alleges, that Saunders has acted with oppression, fraud, and/or malice to deceptively represent or conceal a material fact with intent to deprive Kyphon of rights or otherwise cause injury to Kyphon pursuant to Section 3294 of the California Civil Code for which actions Kyphon is entitled to an award of exemplary damages.

## FOURTH CAUSE OF ACTION
### (Breach of Contract)

### Count I: Misuse of Confidential Information

56. Kyphon incorporates by reference each and every allegation contained in paragraphs 1-55 above as though alleged herein.

57. On or about September 28, 2000, Saunders executed an Employment Agreement with, and Proprietary Information Agreement in favor of, Kyphon under which he agreed to "hold in strictest confidence, and not [] use, except for the benefit of the company, or [] disclose to any person, firm or corporation without written authorization of the Board of Directors of the company, any confidential information of [Kyphon]".

11

58.   Kyphon performed all of the obligations it was required to perform under its agreements with Saunders, and Saunders's performance thereunder was not excused.

59.   Saunders breached his confidentiality agreement with Kyphon by, *inter alia*, disclosing and/or using Kyphon's confidential information related to the commercial exploitation of its kyphoplasty products and services for his own benefit and the benefit of DOT.

60.   As a proximate result of Saunders's breach of his confidentiality agreements, Kyphon has been damaged reparably and irreparably, which damage will continue unless and until Saunders is enjoined by this Court.

**Count II: Improper Contact with and Disclosure to Competitor**

61.   Kyphon incorporates by reference each and every allegation contained in paragraphs 1-60 above as though alleged herein.

62.   On or about September 28, 2000, Saunders executed an Employment Agreement with and Proprietary Information Agreement in favor of Kyphon under which he was prohibited from engaging in employment with or consulting with any other competing business while employed by Kyphon, "revealing confidential information to outsiders, misusing confidential information, and unlawfully discussing prices, costs, customers, sales or markets with competing companies or their employees."

63.   Kyphon performed all of the obligations it was required to perform under its agreements with Saunders, and Saunders's performance thereunder was not excused.

64.   Upon information and belief, Saunders breached his agreement with Kyphon by, *inter alia*, contacting DOT and using Kyphon's confidential information related to the commercial exploitation of its kyphoplasty products and services for his own benefit and the benefit of DOT while employed by Kyphon and thereafter.

65.   As a proximate result of Saunders's breach of his agreements with Kyphon, Kyphon has been damaged reparably and irreparably, which damage will continue unless and until Saunders is enjoined by this Court.

///

12

**FIFTH CAUSE OF ACTION**
**(Breach of Confidence)**

66.    Kyphon incorporates by reference each and every allegation contained in paragraphs 1-65 above as though alleged herein.

67.    Kyphon has spent substantial time, money, and effort developing confidential information relating to the commercial exploitation of its kyphoplasty products and services, including development of research results, product plans, marketing techniques and strategies, and detailed customer client profiles. Such information has not been disclosed to the public generally or to others in the industry, and would be of value to Kyphon's competitors.

68.    As an employee of Kyphon, and as outlined in his Employment Agreement and Proprietary Information Agreement and explained further in the Employee Handbook and other company documents, Saunders had a duty to Kyphon to protect its confidential and proprietary information.

69.    As an employee of Kyphon, Saunders received training in and had access to information about Kyphon's confidential and proprietary information including such information on research, products, services, marketing, sales, and actual and potential customer clients as was need for him to perform effectively as a sales person for Kyphon.

70.    Saunders received confidential and proprietary information as part of his employment with Kyphon, under the term of that employment and for the benefit of his employer. Saunders violated his duty of confidence to Kyphon by using and/or disclosing Kyphon's confidential and proprietary information for the benefit of Kyphon's competitor(s).

71.    Saunders now has a business relationship with Kyphon's competitor, DOT. In the absence of an injunction, he will continue to wrongfully use or disclose Kyphon's confidential and proprietary information and Kyphon will suffer further immediate and irreparable injury, loss, and damage, including, without limitation, damages, the amount of which will not be readily ascertainable, loss of sales, the amount of which will not be readily ascertainable, and irreparable injury to Kyphon's reputation and goodwill.

13

1    72.    As a proximate result of Saunders' breach of confidence and use of Kyphon's

2  confidential and proprietary information, Saunders has and will profit in an amount of which

3  Kyphon is presently uncertain but for which Saunders should be required to account to Kyphon.

4    73.    Kyphon is informed and believes, and on that basis alleges, that Saunders committed

5  the act of breach of confidence willfully and maliciously in that Saunders knowingly used and/or

6  disclosed Kyphon's confidential and proprietary information without Kyphon's permission or

7  knowledge. Saunders' conduct justifies an award to Kyphon of punitive damages  pursuant to

8  Section 3294 of the California Civil Code.

9    74.    Saunders' violation of his duty of confidence to Kyphon was the proximate cause of

10  the injuries and damages suffered by Kyphon as alleged above.

11                            **SIXTH CAUSE OF ACTION**
                                    **(Conversion)**

12

13    75.    Kyphon incorporates by reference each and every allegation contained in paragraphs

14  1-74 above as though alleged herein.

15    76.    Kyphon has a property interest in certain of its confidential information relating to

16  the commercial exploitation of its kyphoplasty products and services, including certain research

17  results, product plans, marketing techniques and strategies, and its detailed customer client profiles.

18    77.    Saunders, by his actions, has wrongfully assumed the right to goods that belong to

19  Kyphon, as evidenced by his intermeddling with the dominion of Kyphon over its proprietary

20  information and his using of that information for his own and DOT's advantage.

21    78.    As a result of the conduct of Saunders alleged herein, Kyphon is entitled to any and

22  all orders and judgments necessary to compensate Kyphon for Saunders's conversion of Kyphon's

23  property.

24    79.    Kyphon is informed and believes, and on that basis alleges, that Saunders has acted

25  with oppression, fraud, and/or malice to deceptively represent or conceal a material fact with intent

26  to deprive Kyphon of rights or otherwise cause injury to Kyphon pursuant to Section 3294 of the

27

28
                                    14
                        COMPLAINT FOR TRADE SECRET MISAPPROPRIATION,
                        UNFAIR COMPETITION, BREACH OF CONTRACT, ET AL.
                                                        Case No.

1  California Civil Code for which actions Kyphon is entitled to an award of exemplary damages in

2  the amount of twice the actual damages and unjust enrichment found.

3  ### SEVENTH CAUSE OF ACTION
   #### (Interference with Prospective Economic Advantage)

4

5      80.    Kyphon incorporates by reference each and every allegation contained in paragraphs

6  1-79 above as though alleged herein.

7      81.    Kyphon has spent substantial time, money, and effort developing relationships with

8  customer clients for the commercial exploitation of its kyphoplasty products and services, including

9  providing training to those clients and creating detailed customer client profiles. By educating its

10 clients in the use of its products and maintaining information about client contacts and purchasing

11 preferences, Kyphon has assured a high probability of future sales to those clients and future

12 economic benefits.

13     82.    Saunders was intimately familiar with the relationship between Kyphon and the

14 clients upon whom he called in his capacity as a Kyphon salesperson. Indeed, Saunders was the

15 person who represented Kyphon in its economic relationship with those clients.

16     83.    Upon information and belief, Saunders intentionally acted so as to disrupt the

17 relationship between Kyphon and its clients, by using the confidential information of Kyphon and

18 contacting Kyphon clients to discuss and sell the products of Kyphon's competitor, DOT.

19     84.    As a proximate result of Saunders's intentional interference with the prospective

20 economic advantage of Kyphon, Kyphon has been damaged reparably and irreparably, which

21 damage will continue unless and until Saunders is enjoined by this Court.

22     85.    Kyphon is informed and believes, and on that basis alleges, that Saunders has acted

23 with oppression, fraud, and/or malice to deceptively represent or conceal a material fact with intent

24 to deprive Kyphon of rights or otherwise cause injury to Kyphon pursuant to Section 3294 of the

25 California Civil Code for which actions Kyphon is entitled to an award of exemplary damages in

26 the amount of twice the actual damages and unjust enrichment found.

27 ///

28
                         15

WHEREFORE, Plaintiff prays judgment against Defendant as follows:

(1)    To enter judgment in favor of Plaintiff on all counts of the complaint;

(2)    For a preliminary and permanent injunction restraining Defendant, his assigns, affiliates, and all those acting in concert with them, from:

(a)    using or disclosing any and all of Plaintiff's confidential and proprietary information;

(b)    soliciting or accepting and business from any customer who is a customer of Plaintiff and for whom Defendant had proprietary and confidential Kyphon data regarding said customer;

(c)    returning or providing to Plaintiff any and all records, documents, or things that contain any of Kyphon's confidential and proprietary information;

(d)    using, disclosing, transferring, revealing (either directly or indirectly) to any person or entity any and all of Plaintiff's confidential and proprietary information.

(3)    For a preliminary and permanent injunction requiring the Defendant, his agents, assigns, affiliates, and all those acting in concert with them, to disclose to the Plaintiffs all records, documents and things derived and/or developed from Plaintiff's confidential and proprietary information.

(4)    For general and specific damages according to proof;

(5)    For the disgorgement of profits or recovery for Defendant's unjust enrichment in an amount according to proof;

(6)    For an award of exemplary damages in an amount twice the award made under subparagraphs (4) and (5) above pursuant to Section 3426.3(c) of the California Civil Code;

(7)    For an award of punitive damages under Section 3294 of the California Civil Code;

(8)    For an award of reasonable attorneys' fees pursuant, *inter alia*, to Section 3426.4 of the California Civil Code;

(9)    For an award of costs;

(10)    For an award of such other and further relief as this Court may deem just and proper.

16



**JURY DEMAND**

Kyphon requests a trial by jury of all claims and issues so triable.

Dated:  July 7, 2004

FISH & RICHARDSON P.C.

By: _____
         David J. Miclean

Attorneys for Plaintiff
KYPHON, INC.

#50212549

17

COMPLAINT FOR TRADE SECRET MISAPPROPRIATION,
UNFAIR COMPETITION, BREACH OF CONTRACT, ET AL.
Case No.

B

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

2004 OCT -8  PM 4: 34

KYPHON INC.,

        Plaintiff,

    v.

DISC-O-TECH MEDICAL
TECHNOLOGIES LTD., and DISC
ORTHOPAEDIC TECHNOLOGIES, INC.,

        Defendants.

C.A. No. 04-204-JJF

**MEMORANDUM IN SUPPORT OF PLAINTIFF KYPHON INC.'S
MOTION FOR A PRELIMINARY INJUNCTION**

FISH & RICHARDSON P.C.
Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607

Frank E. Scherkenbach
Michael R. Hamlin
225 Franklin Street
Boston, MA 02110-2804
Tel: (617) 542-5070
Fax: (617) 542-8906

Karen I. Boyd
500 Arguello Street, Suite 500
Redwood City, CA 94063
Tel: (650) 839-5070
Fax: (650) 839-5071

Attorneys for Plaintiff
KYPHON INCORPORATED

DATED: October 8, 2004

Halkowski Decl., Ex. F; see also Ex. P (article in 'Orthopedics Today', quoting one physician as stating, "I don't want to sound like an evangelist, but I've never done a technique that is so immediately satisfying and gratifying to the patient and the physician.") (also noting that the last patient treated by the physician "arrived in a wheelchair due to back pain and walked out to go home 1 1/2 hours later"). Given the compelling objective evidence of non-obviousness, Kyphon is, therefore, likely to defeat any validity challenge by DOT.

**B.    DOT's Infringement is Irreparably Harming Kyphon**

The second factor in determining whether a preliminary injunction should issue is the extent of irreparable harm that Kyphon will suffer, if a preliminary injunction is not granted. *Hybritech*, 849 F.2d at 1456. Kyphon is entitled to a presumption of irreparable harm because of its likelihood of success on the merits, especially when that likelihood, as here, is strong. *Purdue Pharma*, 237 F.3d at 1367; *see also Oakley*, 316 F.3d at 1345 (finding presumption of irreparable harm even though the merits issues were close); *see also Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 28 U.S.P.Q.2d 1362, 1370 (D. Del. 1993). This presumption comes in part from the finite life of a patent, because the passage of time can cause irreparable harm simply by reducing that effective life. *H.H. Robertson*, 820 F.2d at 390. The very nature of the patent grant weighs against the idea that monetary damages alone can make a patentee whole. The principal value of the patent is Kyphon's statutory right to exclude others, as it desires to do here. The opportunity to practice an invention during the course of patent litigation may itself tempt potential infringers. *Id.* Thus, because of Kyphon's strong showing of a reasonable likelihood of success on the merits, it is entitled to a presumption of irreparable harm.[8]

---

[8]    Absent a finding clearly negating irreparable harm (e.g., that future infringement is no longer likely, that the patentee is willing to forego its right to exclude by licensing the patent, or that the patentee delayed in bringing suit), no basis exists for finding that the presumption of irreparable harm is overcome. *Polymer Tech., Inc. v. Bridwell,*

This case also presents unusual facts that independently support a finding of actual irreparable harm. As the Federal Circuit has pragmatically recognized in *Polymer Tech.*, 103 F.3d at 975-76:

> Competitors change the marketplace. Years after infringement has begun, it may be impossible to restore a patentee's (or an exclusive licensee's) exclusive position by an award of damages and a permanent injunction. Customers may have established relationships with infringers. The market is rarely the same when a market of multiple sellers is suddenly converted to one with a single seller by legal fiat. Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option.

These market effects can never be fully compensated by money. *See Solarex Corp. v. Advanced Photovoltaic Systems, Inc.*, 1995 WL 314742 at 8\* (D. Del.) (agreeing with movant that "loss of existing market share, price erosion and lost market penetration and expansion opportunities" would result in irreparable injury absent grant of a preliminary injunction).

This is particularly true in this case given the extent to which Kyphon's success depends upon building relationships of trust with physicians and caregivers. Since its founding in 1994, Kyphon has diligently been developing its pioneering inventions and educating the medical community. But not until just six months ago did Kyphon truly acquire the full ability to educate the market on the dramatic short- and long-term benefits of its products making now a particularly sensitive time in Kyphon's development. Mott Decl., ¶¶ 12. Because its approach to remedying fractured spines was so dramatically different from the old approach of passively prescribing conventional pain management (e.g., bed rest, narcotic analgesics, and back braces), Kyphon has spent an extensive amount of money to educate family physicians (via Kyphon's Spine Educational Specialists) about the new opportunities for kyphoplasty surgical treatment, as well as to educate and train the orthopedic surgeons on how to use Kyphon's products. *See* Mott Decl., ¶¶ 8-11. Yet, today, the kyphoplasty market is still in its formative stage

---

103 F.3d 970, 975 (Fed. Cir. 1996). No such circumstances overcome the irreparable harm that is presumed to exist here.

– just 6% of the annual total of vertebral compression fractures this year will be treated with Kyphon's groundbreaking approach. *Id.*, at ¶ 6.

The market for kyphoplasty nurtured by Kyphon is now at a critical juncture. Mott Decl., ¶¶ 6, 12-13.

Mott Decl., ¶¶ 12-13. Kyphon is now finally able, without restriction, to educate the medical community regarding all the benefits of kyphoplasty as well as Kyphon's entire KyphX® family of products, which provides all the instruments and materials necessary to perform a kyphoplasty procedure[9] – a complete surgical solution to vertebral compression fractures. Simply put, Kyphon's years of effort cultivating both the technology and the market are now beginning to bear fruit. DOT could not have begun its infringement at a more critical time for Kyphon.

In addition, DOT sales have also resulted in significant monetary damages, even in the short run, which DOT may not be able to pay. Every sale that DOT makes is a sale lost to Kyphon; every device that DOT gives away is a sale lost to Kyphon. Halkowski Decl. Ex. R (Kazaz deposition at 618:3-619:4).[10] Kyphon loses over $4,000 in revenue for every procedure performed with a DOT device instead of a Kyphon device. *See* Mott Decl., ¶ 7. DOT admits that it has sold 319 or so devices in the short period it has been

---

[9] In addition to the IBT products, Kyphon's other instruments include: (1) the KyphX® Osteo Introducer System, which is used to gain access and create a working channel into the inner bone tissue of a fractured vertebral body; (2) the KyphX® inflation syringe, which is used to inflate the IBT; (3) the KyphX® Bone Biopsy Device, which is used to take biopsy samples of potentially cancerous soft bone tissue that might have caused the fracture; (4) the KyphX® Bone Filler Device, which is used to deliver bone filler into the created void; (5) the Kyphon® Mixer, which is used for efficiently mixing and transferring bone cement to the Bone Filler Device; and (6) the KyphX® HV-R Bone Cement.

[10]
    Q.    In other words, if Disc-O-Tech was not in the market, then whatever sales you have made would have been made by Kyphon?
    A.    Currently today? Yes .....

active in the US during 2004, although it has not disclosed how many devices it has given away. D.I. 49 (DOT 9/28/04 letter to court). Those sales easily amount to well over a million dollars of lost revenue to Kyphon, the vast majority of which is lost profit that Kyphon cannot reinvest in its business during this period of necessary growth. In light of DOT's protests that it is just a small company with few employees and meager revenue, DOT's ability to cause this substantial loss of revenue over such a short period of time draws into real question whether Kyphon will ever see any damage award, which counsels against permitting DOT to continue its chosen course of conduct of harming Kyphon in any way it can. Even Kyphon's monetary harm, therefore, may prove irreparable.

Moreover, given DOT's aggressive underpricing strategies, price erosion in order to compete becomes a real concern if it is permitted to continue to penetrate the market. *See* Borgstede Decl., ¶ 2 (DOT offering to buy out the hospital's "entire stock of Kyphon products off the hospital shelves" and proposal to discount the infringing DOT product by $100 "per case" less than Kyphon's product). Each day that DOT aggressively sells the infringing product, Kyphon faces a very real risk of permanent, irreversible price erosion.

DOT has also aggressively pursued doctors who are high-volume customers of Kyphon's products, and induced them to work with DOT's devices. *See* Mott Decl., at ¶

at ¶ 4. A substantial part of Kyphon's educational effort, and expense, is to provide Spine Education Specialists to inform primary care physicians – who ultimately refer patients to orthopedic surgeons – about the new remedy provided by Kyphon's products. Yet Kyphon gains no sales from this education of referring physicians, and instead only actually realizes revenue if the surgeon to whom the patient is referred actually uses Kyphon's products to perform the surgery. *See* Mott Decl., at ¶¶ 8-11. DOT's targeting

23

of key surgeons interrupts this chain and leaves Kyphon with an untenable choice.  As

explained by Kyphon's CEO, Kyphon's Spine Education Specialists, can either:

> (i) continue to assist in referring patients to Kyphon's former key surgeons, whom DOT has co-opted into using DOT's products for at least some of their cases and thereby continue to lose revenue in those cases where DOT's products are used; or

> (ii) cease identifying in its marketing, promotional and educational activities those surgeons who use DOT's products, which could irretrievably damage the relationship between Kyphon and those surgeons and which might reduce the number of patients who ultimately benefit from Kyphon's technology

Mott Decl., at ¶ 14.  By poaching Kyphon's surgeons, DOT has also taken advantage of

the extensive training that Kyphon provides to its surgeons.  Kyphon has a policy of

requiring that surgeons attend a rigorous training session on kyphoplasty, "including a

minimum of 6 to 8 hours of classroom and hands-on training with its products and how to

perform kyphoplasty." Mott Decl., at ¶ 16.  DOT appears to have no formal training

program of its own, and has consistently advised doctors that the DOT accused device

could simply be "substituted" for Kyphon's product for the remedying of vertebral

compression fractures.  *See* Lane Decl., ¶ 5.  Once trained by Kyphon and poached by

DOT, Kyphon's investment in training these doctors is irreparably lost unless Kyphon

can somehow recapture every surgeon.

     Finally, in addition to making distorted and unsubstantiated attacks upon

Kyphon's products that may prove difficult if not impossible to undo

 

          )), Kyphon

also believes discovery will show that DOT has targeted Kyphon's sales people, similar

to DOT's targeting of Kyphon's surgeons, and thereby induced unlawful conduct as set

forth in a complaint recently filed in the State of California.  *See, e.g.*, Halkowski, Decl.,

Ex. G.  Discovery in the state action has already established that one former Kyphon

24

sales person discussed employment and in fact signed a consultancy agreement with DOT while he was still employed by Kyphon. Halkowski Decl., Ex. S.

Collectively, these examples of irreparable harm go far beyond the typical patent case. Indeed, DOT's familiar drumbeat of how little it is compared to Kyphon actually supports Kyphon's point: That DOT, with so few employees, no sales force, and no history in the market, can so quickly do what it has, including causing Kyphon well over a million dollars in lost revenue in so short a period of time, hints at the momentum DOT will be able to build if it were permitted to continue to infringe Kyphon's valid patents through trial. Considering in addition that irreparable is presumed from Kyphon's strong showing on the merits of its suit, Kyphon has clearly shown the existence of sufficient irreparable harm to satisfy this prong of the preliminary injunction test. DOT should not be permitted to continue its conduct.

### C.    The Balance of Hardships Favors Kyphon

The third factor to be considered in determining whether to grant Kyphon's motion is the balance of hardships. *Hybritech*, 849 F.2d at 1457. In balancing hardships, the magnitude of the threatened injury to the patent owner is weighed, in light of the strength of the showing of likelihood of success on the merits, against the injury to the accused infringer. *H.H. Robertson*, 820 F.2d at 390.

As noted above, Kyphon faces immediate hardship that cannot be completely compensated with monetary damages, and given DOT's alleged meager resources, DOT may not even be able to compensate Kyphon for the direct monetary damages that are now being suffered. Beyond that, DOT assumed the risk of infringement when it chose to enter this market with the knowledge that Kyphon had patented its kyphoplasty approach. See Halkowski Decl., Ex. T; *see also*, *Telebrands Direct Response Corp. v. Ovation Communications, Inc.*, 802 F. Supp. 1169, 1179 (D.N.J. 1992) ("When the cost of the risk assumed by the infringer to enter the market is weighed against the irreparable harm of patent infringement," the balance of hardships tips in favor of the patent owner.)

25

Dated: October 8, 2004          FISH & RICHARDSON P.C.

By: _____
    Thomas L. Halkowski (#4099)
    919 N. Market Street, Suite 1100
    P.O. Box 1114
    Wilmington, DE 19899-1114
    Tel: (302) 652-5070
    Fax: (302) 652-0607

    Frank E. Scherkenbach
    Michael R. Hamlin
    225 Franklin Street
    Boston, MA 02110-2804
    Tel: (617) 542-5070
    Fax: (617) 542-8906

    Karen I. Boyd
    500 Arguello Street, Suite 500
    Redwood City, CA 94063
    Tel: (650) 839-5070
    Fax: (650) 839-5071

    Rama G. Elluru (admitted only in Texas and Virginia)
    1425 K Street, N.W.
    Washington, DC 20005
    Tel: (202) 783-5070
    Fax: (202) 783-2331

Attorneys for Plaintiff
KYPHON INC.

C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KYPHON INC.

      Plaintiff,

    v.

DISC-O-TECH MEDICAL
TECHNOLOGIES LTD., and DISC
ORTHOPAEDIC TECHNOLOGIES, INC.

      Defendants.

C.A. 04-204-JJF

**CONFIDENTIAL**
**ATTORNEY'S EYES ONLY**
**PURSUANT TO PROTECTIVE ORDER**

**DECLARATION OF ANDREW V.S. DOGGETT
IN SUPPORT OF PLAINTIFF KYPHON INC.'S
MOTION FOR A PRELIMINARY INJUNCTION**

DATED:  October 8, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KYPHON INC.,

       Plaintiff,

    v.                   CA 04-204-JJF

DISC-O-TECH MEDICAL
TECHNOLOGIES LTD., and DISC
ORTHOPAEDIC TECHNOLOGIES, INC.,

       Defendants.

DECLARATION OF ANDREW V.S. DOGGETT IN SUPPORT OF PLAINTIFF
KYPHON INC.'S MOTION FOR A PRELIMINARY INJUNCTION

CONFIDENTIAL, EYES ONLY – SUBJECT TO PROTECTIVE ORDER

I, Andrew V.S. Doggett, declare as follows:

1.    I have personal knowledge of the matters described in this declaration, and could competently testify to them if called upon to do so.

2.    I have been employed by Kyphon Inc. ("Kyphon") since August 2001. Before January 2004, I was a Spine Associate in Louisiana and Mississippi for about a year and then was promoted to Spine Consultant in Mississippi. Since January 2004, I have held the position of Regional Sales Manager ("RSM") for Kyphon for the Bayou region, which includes Louisiana, Mississippi, Arkansas and western Tennessee.

3.    My responsibilities as RSM for the Bayou region include managing the team of Spine Consultants that works my region. Through my responsibilities, I am intimately aware of the status of Kyphon's business in the region I cover.

4.    During my employment with Kyphon,        of New Orleans, Louisiana has been one of the most active surgeon users of Kyphon's product line in my territories. In the third and fourth quarters of 2003 and the first quarter of 2004, for example,        performed 12, 10, and 13 kyphoplasties, respectively, using Kyphon's products, accounting for about        during that period. In the second quarter of 2004, however, Disc-O-Tech ("DOT") started distributing its SKy Bone Expander for kyphoplasty in my territory and targeted        for conversion. As a result,        has almost entirely ceased using Kyphon's

OCT-06-04 FRI 01:59 PM RANDY+BROWN+8+8+8          77030683494          P.02

products. For example, during the second and third quarters of 2004, ~~~~~~~ performed just two and three cases, respectively, using Kyphon's products. The actions of DOT and ~~~~~~~ have significantly impacted the revenue production of my territory and Kyphon's relationship with ~~~~~~~

5.     I understand ~~~~~~~ ceased working with Kyphon in large part because of this relationship with ~~~~~~~ a former Kyphon employee. Kyphon is presently in litigation with ~~~~~~~ over DOT's interactions with him even before he left Kyphon's employment, and the information he imparted to DOT both before and after leaving Kyphon.

I declare under penalty of perjury that the above is a true and correct statement. Executed this  6   day of October, 2004, at  Memphis ,  Tennessee .

Andrew V.S. Doggett

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of October 2004, a true and correct copy of the attached DECLARATION OF ANDREW V.S. DOGGETT IN SUPPORT OF PLAINTIFF KYPHON INC.'S MOTION FOR A PRELIMINARY INJUNCTION was caused to be served on the attorneys of record at the following addresses as indicated:

**VIA HAND DELIVERY**
Maryellen Noreika
Morris Nichols Arsht & Tunnell
1201 North Market Street, Suite 2100
P.O. Box 1347
Wilmington, DE  19899-1347

Attorneys for Defendants
*Disc-O-Tech Medical Technologies Ltd.*
*and Disc Orthopaedic Technologies, Inc.*

**VIA FIRST CLASS MAIL**
Julie A. Petruzzelli
Eric S. Namrow
Venable LLP
575 7th Street, N.W.
Washington, DC 20004

Attorneys for Defendants
*Disc-O-Tech Medical Technologies Ltd.*
*and Disc Orthopaedic Technologies, Inc.*

_____
Thomas L. Halkowski (#4099)